## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KIMBERLY SUE TIMON,          )
                                          )
                  Plaintiff,          )               Civil Action No. 12-271
                                            )
                      v.                )               Judge Donetta W. Ambrose
                                            )               Magistrate Judge Susan Baxter
CAROLYN W. COLVIN,[1]         )
Acting Commissioner of Social Security,  )
                                          )
                  Defendant.     )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").

### II.  REPORT

#### A.    BACKGROUND

1. Procedural History

Kimberly Sue Timon ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401- 434 ("Act"). Plaintiff filed for benefits,

---

[1] Ms. Colvin became the Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as the named defendant in this suit in place of Michael J. Astrue, who previously served as Commissioner. *See* Fed.R.Civ.P. 25(d).

claiming a complete inability to work as of August 4, 2008, due primarily to vertigo and migraine headaches. (R. at 123-128, 143).[2] Her application was denied, (R. at 65-68), and having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 10, 13).

2. General Background

Plaintiff was forty five years old on the date of the ALJ's decision and has a high school education. (R. at 31, 149). Plaintiff's job history included employment as an insurance agent and retail store manager. (R. at 144). She lived with her husband, daughter, and granddaughter (R. at 42). Plaintiff reported that she was able to clean house and do laundry, drive, shop with her husband for groceries twice a week, watch television, and spend time with family members once a week. (R. at 174-176). Plaintiff further reported that she could walk for approximately 100 yards before needing to stop and rest, and that squatting and bending caused dizziness. (R. at 177). She reported no limitations with regard to lifting, kneeling, using her hands or getting along with others. (R. at 177). Plaintiff stopped working on August 4, 2008 following treatment for a sinus and ear infection, and after being diagnosed with vertigo. (R. at 42-43).[3]

3. Treatment History

Plaintiff was seen by David Kruszewski, D.O., her primary care physician, on May 4, 2008 and complained of nausea and dizziness for the three days previous to the appointment. (R. at 201). She was assessed with probable benign positional vertigo and advised not to drive. (R. at 201). When seen on September 18, 2008, Plaintiff was diagnosed with sinusitis and left

---

[2] Citations to the administrative record (ECF No. 7), will be designated by the citation "(R. at __.)"

[3] In her Brief in Support of her Motion for Summary Judgment, Plaintiff claims disability due to both physical and mental impairments. (ECF No. 11 at 6). However, she only challenges the ALJ's decision with respect to the evaluation of the medical evidence relative to her physical impairments. We therefore confine our discussion accordingly.

otalgia and was prescribed an antibiotic. (R. at 200). On October 6, 2008, a CT scan of the paranasal sinuses showed a mild nasal deviation to the right and an otherwise unremarkable paranasal sinus study. (R. at 205).

On October 23, 2008, Plaintiff was evaluated by Sean Carroll, D.O., an ear, nose and throat specialist, for complaints of headaches, a sinus/ear infection, and dizziness. (R. at 202-204). Plaintiff reported that her sinus problems started a few years earlier, while her vertigo problems started three months prior. (R. at 202). She indicated, however, that her moderate symptoms had improved with antibiotics. (R. at 202). She reported that she smoked less than one-half a pack of cigarettes a day, and had smoked for twenty to twenty five years. (R. at 202). Plaintiff's physical examination was unremarkable with no abnormalities seen. (R. at 203-204). A dizzy exam (DIX Hallpike Test) was performed, with no nystagmus noted on the left side and moderate nystagmus on the right side, with moderate vertigo. (R. at 204). Dr. Carroll reviewed the Plaintiff's sinus CT scan, and found no disease contributing to her headaches. (R. at 204). He recommended she follow up with her primary care physician or a neurologist if her headaches persisted. (R. at 204). Plaintiff was diagnosed with benign paroxysmal positional vertigo. (R. at 204).

On November 10, 2008, Plaintiff presented to the emergency room with complaints of dizziness. (R. at 209). A CT of the Plaintiff's brain was unremarkable, and she was diagnosed with acute vertigo and prescribed medication. (R. at 211-212).

Plaintiff was evaluated Jingzi Shang, M.D., a neurologist, for her dizziness and headache complaints on December 12, 2008. (R. at 225). Plaintiff reported a history of ear/sinus infections, vertigo, nausea, and headaches. (R. at 225). She claimed her symptoms worsened following treatment in her right ear with a vibrating device. (R. at 225). She denied any hearing

3

loss. (R. at 225). Plaintiff claimed she suffered from daily headaches with sensitivity to light and sound with occasional flashes of light, and had some weakness in her neck due to the pain. (R. at 225). Plaintiff further reported difficulty sleeping, joint pain, muscle weakness, numbness, and difficulty with balance. (R. at 226). Dr. Shang noted potential dietary triggers, including cheeses, processed meat, chocolate, and MSG products. (R. at 225). Plaintiff smoked less than a half a pack of cigarettes per day, drank five to six cups of coffee per day, did not regularly exercise, and was able to drive. (R. at 226). Plaintiff took ibuprofen three times per week to alleviate her headaches. (R. at 225).

On physical examination, Dr. Shang reported that Plaintiff's speech and language were normal, her cranial nerves were within normal limits, her muscle tone, bulk strength, and reflexes were normal, and cerebellar coordination was normal. (R. at 227). Plaintiff's gait was intact, her station and posture were normal, and she was able to tandem walk. (R. at 227). Dr. Shang reported that Plaintiff complained of dizziness when taken from a supine to a sitting position. (R. at 227). Dr. Shang found no nystagmus on examination even though Plaintiff was experiencing vertigo symptoms. (R. at 228). Plaintiff was assessed with atypical migraine, with possible vertiginous migraine with associated nausea, and prescribed Treximet, Phenergan, Zoloft, and Imitrex. (R. at 228). She was further assessed with benign paroxysmal positional vertigo, prescribed Valium, and an MRI was ordered. (R. at 228).

An MRI of the Plaintiff's brain dated December 30, 2008 revealed no intracranial hemorrhage or acute infarct, no abnormal enhancement or discreet mass, and negative posterior fossa evaluation. (R. at 213).

On January 7, 2009, Plaintiff reported that her dizziness symptoms had improved. (R. at 224). When seen by Dr. Shang on February 19, 2009, Plaintiff continued to report improvement

4

in her dizziness symptoms, but complained of daily headaches with nausea. (R. at 221). She further complained of numbness and balance difficulties, but had no joint or muscle complaints. (R. at 222). Her physical examination was unremarkable, and her diagnoses and medications remained unchanged. (R. at 222-223). Dr. Shang ordered a sleep study for possible obstructive sleep apnea disorder causing disequilibrium and headache. (R. at 223). The sleep study dated March 27, 2009, revealed snoring and mild sleep apnea, but was not diagnostic for obstructive sleep apnea disorder. (R. at 232).

Plaintiff returned to Dr. Shang on May 28, 2009 and complained of headaches, difficulty with balance, episodes of dizziness, and bilateral ear pain. (R. at 217-218). She denied suffering from any joint or muscle problems, and had no numbness complaints. (R. at 218). Plaintiff claimed she suffered from a severe headache once per week. (R. at 217). Her physical examination was unremarkable except some tenderness was found of the right mastoid sinus on pressure. (R. at 219). Plaintiff's medications remained unchanged, and Dr. Shang referred her back to Dr. Carroll or Dr. Kruszewski for her ear pain. (R. at 220).

When seen by Dr. Shang on August 26, 2009, Plaintiff complained of daily headaches, constant dizziness with a spinning sensation, and right ear pain. (R. at 323). Her diagnoses remained the same and Dr. Shang adjusted her medications. (R. at 325-326). When seen by Dr. Kruszewski for her annual physical on October 12, 2009, Plaintiff reported she had been feeling fine since her last office visit. (R. at 360). Her physical examination was unremarkable, and Dr. Kruszewski reported that her gait and stance were normal, and her deep tendon reflexes were normal. (R. at 361).

On December 2, 2009, Plaintiff reported to Dr. Shang that her dizziness was better, but had recurred one week prior, and that she suffered from a severe headache once a week with pain running down her spine. (R. at 319).

On March 3, 2010, Plaintiff reported that her dizziness symptoms had decreased in intensity. (R. at 315). She indicated that her headaches fluctuated and occurred sporadically, two to three days a week, alternating headache free periods for a few days. (R. at 315). Plaintiff reported that Maxalt usually helped with her headache and dizziness symptoms. (R. at 315). Dr. Shang suspected Plaintiff had fibromyalgia since she also complained of diffuse pain on palpation, bilateral weakness, and radiating pain from her back to her leg. (R. at 318). She ordered lab studies and an EMG of Plaintiff's lower extremities. (R. at 318). An EMG dated March 12, 2010 revealed no evidence for a right lower extremity radiculopathy, plexopathy, or mononeuropathy. (R. at 346).

When seen by Dr. Kruszewski on March 25, 2010, Plaintiff complained of a headache, nausea, fatigue, myalgia, and tingling and burning in her extremities. (R. at 352). Dr. Kruszeski noted that the Plaintiff's blood work revealed her to have low B12. (R. at 352). She was diagnosed with, *inter alia*, vitamin B12 deficiency and myalgia. (R. at 353).

Plaintiff returned to Dr. Shang on September 30, 2010 and reported suffering from minor headaches daily, which were better with lying down. (R. at 310). She stated that she suffered from severe headaches only once or twice a month and that Maxalt helped her symptoms. (R. at 310). She continued to experience dizziness, and complained of muscle pain and spasm. (R. at 310). Dr. Shang reported that her headaches and vertigo had improved. (R. at 313). She further reported that Plaintiff's EMG examination was negative, and was consistent with fibromyalgia.

(R. 313). Dr. Shang noted that Plaintiff was undergoing vitamin B12 injection therapy for a vitamin D deficiency. (R. at 313).

When seen by Dr. Kruszewski on October 5, 2010, it was noted that Plaintiff had started vitamin B12 shots and was recently diagnosed with fibromyalgia. (R. at 342). Plaintiff reported neuromuscular/connective/soft tissue complaints, but her physical examination was unremarkable. (R. at 343). She was assessed with, *inter alia*, obstructive sleep apnea, B12 deficiency, and fibromyalgia. (R. at 343). Plaintiff's next visit with Dr. Kruszewski on November 8, 2010 was for a routine gynecological examination. (R. at 337-339).

On February 10, 2011, Plaintiff reported to Dr. Shang that she suffered from headaches that felt like muscle spasms, with nausea and some light sensitivity. (R. at 305). She indicated that she needed to lie down and rest when suffering from a headache. (R. at 305). Plaintiff reported that she had two to three days during the week that were headache free. (R. at 305). Plaintiff further reported joint pain, muscle pain, cramps and weakness, numbness and tingling, and episodes of dizziness, but no balance difficulties. (R. at 306). On physical examination, Dr. Shang reported that Plaintiff's gait was intact, her station and posture were normal, and she was able to tandem walk. (R. at 307). Dr. Shang reported that Plaintiff's headaches had improved, and encouraged her to engage in regular exercise and sun exposure. (R. at 308).

4. Functional Capacity Assessments

On July 7, 2009, Frank Bryan, M.D., a state agency reviewing physician, reviewed the medical evidence of record and completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. at 253-261). Dr. Bryan concluded that Plaintiff could perform light work with occasional climbing of ramps/stairs, but could never climb a ladder/rope/scaffold. (R. at 255). He further found Plaintiff could frequently balance, stoop, kneel, crouch and crawl. (R.

at 255). Plaintiff had no manipulative, visual or communicative limitations. (R. 255-256). Dr. Bryan found Plaintiff should avoid even moderate exposure to hazards such as machinery and heights. (R. at 256). Dr. Bryan noted that Plaintiff had provided inconsistent information regarding her daily activities. (R. at 260).

On April 4, 2011, Dr. Kruszewski completed a Treating Medical Source Statement Regarding the Nature and Severity of an Individual's Physical Impairments. (R. at 370-372). Dr. Kruszewski opined that Plaintiff was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; could stand/walk for 1 hour in an 8-hour workday; and could sit for 1 hour in an 8-hour workday, and should be afforded a sit/stand option every 20 minutes. (R. at 370-371). Dr. Kruszewski further opined that Plaintiff was limited in her push/pull ability; could never climb, crouch, or crawl; and could occasionally balance, kneel, stoop, reach, handle and finger. (R. at 371). He indicated that Plaintiff should avoid temperature extremes, noise, vibration, fumes, odors, chemicals and gases. (R. at 372). Dr. Kruszweski stated that Plaintiff would be unable to complete a full work day and full work week due to her medical impairment. (R. at 372). In support of his assessment, Dr. Kruszewski cited to his personal observation and interview with Plaintiff. (R. at 372). No objective medical findings or narrative accompanied the assessment.

5. Administrative Hearing

Plaintiff and Eugene Czuczman, a vocational expert, testified at the hearing held by the ALJ. (R. at 38-62). Plaintiff testified that she had previously worked part-time, but stopped after a sinus and ear infection caused dizziness. (R. at 42-43). Plaintiff further testified that she was subsequently diagnosed with vertigo, and that a procedure performed by her ENT physician triggered migraine headaches. (R. at 42-43). She indicated that she had a driver's license but did

not drive, her husband did the grocery shopping, and her husband and daughter took care of the cooking, cleaning and laundry. (R. at 44-45). Plaintiff claimed she spent most of her time watching television and occasionally reading, but reading triggered headaches. (R. at 45). Plaintiff testified that she could stand for 20 minutes and walk for half a mile, but muscle spasms in her legs and back precluded her from sitting and walking for extended periods of time. (R. at 53). Plaintiff stated that she suffered from migraine headaches two to three times a week, lasting anywhere from four to forty eight hours, during which time she would lie in bed in darkness and take medication. (R. at 54-55).

Following Plaintiff's testimony, the ALJ asked the vocational expert to assume an individual of the same age, educational background, and work experience as Plaintiff, who was capable of performing light work, but was limited to occasional squatting and bending, and should avoid ladders, hazards, dangerous heights, and machinery. (R. at 56). The hypothetical individual should also avoid exposure to heat, cold, dust, fumes, gases or vibrations, should be afforded a sit/stand option, and was restricted to occasional contact with the general public. (R. at 56, 59-60). The vocational expert testified that such an individual could perform the jobs of assembler, printed products; inserting machine operator; and folding machine operator. (R. at 57).

B.   ANALYSIS

   1.   Standard of Review

   To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months.

9

42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. § 404.1520.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-5, (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v.*

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

*Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999).  Section 405(g) permits a district court

to review the transcripts and records upon which a determination of the Commissioner is based;

the court will review the record as a whole.  *See* 5 U.S.C. §706.  The district court must then

determine whether substantial evidence existed in the record to support the Commissioner's

findings of fact.  *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v.

Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401

(1971)).  If the Commissioner's findings of fact are supported by substantial evidence, they are

conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  When considering a case, a

district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the

evidence of record; the court can only judge the propriety of the decision in reference to the

grounds invoked by the Commissioner when the decision was rendered.  *Palmer v. Apfel*, 995 F.

Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).  The

court will not affirm a determination by substituting what it considers to be a proper basis.

*Chenery*, 332 U.S. at 196-97.  Further, "even where this court acting *de novo* might have reached

a different conclusion . . . so long as the agency's factfinding is supported by substantial

evidence, reviewing courts lack power to reverse either those findings or the reasonable

regulatory interpretations that an agency manifests in the course of making such findings."

*Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

---

42 U.S.C. § 1383(c)(3).

2. <u>Discussion</u>

The ALJ concluded that Plaintiff's benign paroxysmal positional vertigo, migraine headaches and obesity were severe impairments, but determined at step three that she did not meet a listing. (R. at 26-27). The ALJ found that she was able to perform work at the light level with a sit/stand option, with only occasional squatting or bending, and occasional contact with the general public, but was precluded from climbing ladders, being around hazards, dangerous heights or machinery, and being exposed to heat, cold, dust, fumes, gases, or vibrations. (R. at 27). At the final step, the ALJ determined that the testimony of the vocational expert supported a finding that Plaintiff could still obtain a significant number of full-time jobs in the national economy. (R. at 31-32). Accordingly, the ALJ concluded that Plaintiff was not eligible for DIB under the Act. (R. at 32). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S. C. § 405(g).

Plaintiff argues that the ALJ improperly rejected the opinion of her treating physician, Dr. Kruszewski, relative to her residual functional capacity.[6] The Third Circuit has repeatedly held that "[a] cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a

---

[6] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121.

treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

Here, the ALJ stated the following with respect to Dr. Kruszewski's opinion:

On April 4, 2011, David Kruszewski, D.O., a family practitioner, completed a Treating Medical Source Statement Regarding Nature and Severity of an Individual's Physical Impairment (Exhibit 10F). Dr. Kruszewski opines that the claimant is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; she can stand/walk for less than 1 hour in an 8-hour workday; she can sit for 1 hour in an 8-hour workday and should be afforded a sit/stand option every 20 minutes; she is limited in her ability to push and pull, occasional balancing, kneeling, and stooping but should never climb, crouch, or crawl; limited reaching in all directions and fingering; and should avoid temperature extremes, noise, vibration, and hazards. Dr. Kruszewski further states that the claimant is unable to complete a full work day due to her medical impairment. The undersigned agrees with the lifting limitations, the sit/stand option, avoiding ladders, hazards, dangerous heights, machinery, and exposure to heat, cold, dust, fumes, gases, or vibrations, and affords this portion of Dr. Kruszewski's opinion some weight, to the extent it is consistent with the above stated residual functional capacity. However, the undersigned affords the remainder of Dr. Kruszewski's opinion little weight as it is not supported by the record as a whole, including Dr. Kruszewski's treatment records. Specifically, the form completed by Dr.

> Kruszewski does not cite to any treatment record or objective medical testing to support finding that the claimant is unable to work full-time, instead Dr. Kruszewski states that personal observation and the claimant's interview support his conclusions (Exhibit 10F). Further, there is no evidence that Dr. Kruszewski, a family practitioner, has any training or specialty in the field of occupational medicine or neurology. Moreover, opinions as to whether a claimant is disabled are reserved for the Commissioner (20 CFR 404.1527(e); SSR 96-5p).

(R. at 30).

As set forth above, an ALJ may discredit a treating physician's opinion if other evidence contradicts it. *Morales*, 225 F.3d at 317. Here, the ALJ discussed the medical and opinion evidence, and ultimately rejected that portion of Dr. Kruszewski's opinion that Plaintiff would be unable to work full-time on the permissible ground that it was unsupported by the record as a whole, including Dr. Kruszewski's own treatment records. (R. at 30). In this regard, the ALJ observed Plaintiff was seen by Dr. Kruszewski in May 2008 and complained of nausea and dizziness, but her CT scan of the paranasal sinuses was essentially unremarkable. (R. at 28). The ALJ noted that a dizzy exam revealed moderate dizziness, but an MRI of Plaintiff's brain revealed no abnormalities. (R. at 29). The ALJ further noted that Plaintiff's EMG test was negative for right lower extremity radiculopathy, plexopathy or mononeuropahty. (R. at 29). The ALJ observed that Plaintiff reported to Dr. Shang, her treating neurologist, that her dizziness and headache symptoms had improved, and the Dr. Shang reported an improvement in the Plaintiff's condition. (R. at 29). All of these findings are supported by the record and constitute substantial evidence defeating Dr. Kruszewski's disabling limitations.

The ALJ further discredited Dr. Kruszewski's opinion since there was no evidence that he was a specialist in occupational medicine or neurology. (R. at 30). Plaintiff argues that the ALJ's reasoning in this regard was inconsistent with her decision

to assign significant weight to Dr. Bryan's opinion, since Dr. Bryan's specialty was in orthopedics. *See* (ECF No. 11 at pp. 10-11). It is well settled, however, that state agency reviewing physicians are "highly qualified … who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012) ("State agent opinions merit significant consideration as well."). Moreover, this reason was not the sole reason advanced by the ALJ for discrediting Dr. Kruszewski's opinion. We therefore find no error in this regard.

We further reject the Plaintiff's contention that the ALJ should have recontacted Dr. Kruszewski for clarification regarding the basis of his opinion or his particular qualifications. The Commissioner's regulations provide that an ALJ must recontact a medical source "when the report from [Plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (quoting 20 C.F.R. § 416.912(e)(1)).[7] Recontact is only required however, when "the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled." *Id*. Here, the record was sufficiently developed for the ALJ to make a disability determination. The ALJ thoroughly examined and discussed Plaintiff's treatment history, including her reported symptoms. (R. at 28-31). The ALJ also reviewed and discussed Plaintiff's written statements to the agency and her testimony from the hearing. (R. at 28, 30-31). Consequently, we conclude that the ALJ did not err in failing to recontact Dr. Kruszewski for "clarification" of his opinion.

---

[7] The SSA eliminated this provision and § 404.1512(e)(1), effective March 26, 2012. *See generally* How We Collect and Consider Evidence of Disability, 77 Fed.Reg. 10,651 (Feb. 23, 2012). The new protocol for recontacting medical sources is set forth in 20 C.F.R. §§ 404.1520b, 416.920b. *See Gray v. Astrue*, 2012 WL 1521259 at *3 n.1 (E.D.Pa. 2012).

Plaintiff further argues that the ALJ erred in assigning significant weight to the opinion of Dr. Bryan with respect to her RFC, since it was rendered without the benefit of the complete record. *See* (ECF No. 11 at pp. 12-13). We reject this argument. The Third Circuit has addressed this issue, stating: "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no time limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler*, 667 F.3d at 361 (finding that the ALJ properly relied on records that were "a few years old").

Moreover, Dr. Kruszewski's treatment records do not support Plaintiff's contention that her condition clearly "worsened" following Dr. Bryan's assessment. Rather, the treatment records reveal that Plaintiff was seen by Dr. Kruszeski in October 2009 for a routine physical and reported feeling fine, and her physical examination was unremarkable. (R. at 360). Plaintiff did complain of headaches and myalgia at her March 2010 visit, and had soft tissue complaints at her October 2010 visit, but her physical examination was unremarkable. (R. at 352-353, 343). Plaintiff's November 2010 visit was for a routine gynecological examination. (R. at 337-339).

Finally, Plaintiff claims that the ALJ's reliance on Dr. Bryan's assessment was suspect since it was rendered on a "form report" constituting "weak evidence at best" of her functional limitations. *See* (ECF No. 11 at pp. 13-14). Contrary to the Plaintiff's argument, however, Dr. Bryan's assessment was accompanied by an explanation for his findings. In concluding that Plaintiff could perform light work with some postural and environmental limitations, Dr. Bryan included Dr. Shang's treatment note dated February 19, 2009, which revealed that Plaintiff's vertigo symptoms had improved and her physical examination was unremarkable. (R. at 258-260). Dr. Bryan also noted that Plaintiff had provided inconsistent information regarding her

daily activities. (R. at 260). He observed that Plaintiff alleged performing few, if any, household chores, but the overall evidence suggested she had the ability to care for herself, maintain her home, and drive. (R. at 260). Accordingly, we find no error in the ALJ's partial reliance on Dr. Bryan's assessment in evaluating Plaintiff's RFC.

**C.  CONCLUSION**

Based upon the foregoing, we conclude that the ALJ's findings regarding the weight accorded to the medical opinions was supported by substantial evidence and complied with applicable law. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.


October 30, 2013

*s/ Susan Paradise Baxter*
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.